Good morning, ladies and gentlemen. Our first case for argument, United States v. Kohli, Mr. Sindel. May it please the Court, it's my intention to address primarily point one in our brief concerning the sufficiency of the evidence in this particular case. The case is unusual in that this was a situation in which the government reviewed 500 files that were seized from Dr. Kohli's office and came up with 10 that they believed were appropriate for prosecution, which was 2% of the entire patient population he was treating. It's our position that there are equal or nearly equal circumstantial support for the theory of guilt as well as for the theory of innocence as set out in U.S. v. Casser from the Sixth Circuit. Part of the circumstances here was an expert witness who testified on behalf of the government, who is familiar to this Court, you know, based on its decision in United States v. Chubb, who recognized he also appeared as an expert in the Eighth Circuit case. And in this particular case, the cross-examination established that Dr. Perens had been testifying for the government for approximately 20 years, and in that 20 years he found 40 to 50 physicians guilty of inappropriate prescription and prescribing of medications that were outside the appropriate scope. But as you point out, that came out on cross-examination, so the jury knew that, and the jury could make a judgment, a credibility judgment, with respect to his, as you would say, habit of testifying on behalf of the government. That is true. Because it's not your position that an expert can't be asked about an opinion as to whether a physician acted for a legitimate medical purpose. Not at all. In fact, it would require, I believe, an expert, because I believe it's beyond the scope of what a jury of laypeople might know. I think it is appropriate to comment on that. But one of the particular things about this particular case that makes this unusual is that every physician who testified in the case testified that all of the patients that were involved in the counts of conviction had legitimate medical problems and legitimate medical pain as a result of injuries, surgeries. The litany of what these patients had gone through and the descriptions that were offered concerning their physical complications and problems were significant. Well, some of the patients received prescriptions even though they were using heroin or other drugs, and a lot of them were sourcing, they were getting medication from many sources, and they were testing positive for other drugs, not the ones that the defendant had prescribed. That's not enough? Well, I believe, well, I don't believe that is enough. I believe that the circumstances would require a physician who was conducting an appropriate business to examine those. Well, isn't there a frequency problem? I'm sorry, excuse me? Isn't there a frequency problem? When you say a frequency problem? These patients who come back every two weeks and so on. Well, most of the patients were seen on a monthly basis. There were some that came in a couple of days early or maybe as much as a week early. Just a couple of days early? I don't think that's correct. Well, I believe that there was... That's the most, two days early? No, I didn't say that was the most. Well, you said some came in two days early. Some came in more than two days early. That's correct. What was the most early any of them came in? I don't believe I can recall one particular instance. Well, you ought to know that. That's important. Well, I believe the earliest one I can recall was about seven days, but I may be wrong on that. Are you referring to that Michael Knabe who got OxyContin with many early visits and had multiple positive tests for non-prescribed drugs, but not for prescribed drugs? Isn't that a signal to the doctor that something is amiss? Yeah, and I believe that Mr. Knabe testified at the trial that the doctor addressed those issues with him and told him he could not see other physicians and he could not obtain controlled substances from other physicians as it was in violation of their agreement as doctor and patient. Some of these were addressed. I don't think there's... These patients had legitimate pain issues. Well, what about this Aaron Teffel? The doctor continued to prescribe meds even after the VA hospital called, told him he had a problem with drugs, and the parents caught him injecting controlled substances and multi-sourcing and positive tests. I mean, what about him? Well, in that particular situation... When the VA calls and says, you know, big problem. In that particular situation, Dr. Coley prescribed him Percocet, which is a drug that cannot be easily administered by IV injection, and that was the purpose of that. He tried to address that particular issue. And I think when Dr. Teffel, I mean, Aaron Teffel testified, he testified as to, you know, how painful it was and that frequently he would run out of his medication, he would be taken to the hospital, and he would get additional medication for a few days. I think every... What do you mean he ran out of his medication? He may have used too much medication for what they called, that was testimony that there was breakthrough pain, and sometimes the pain would be so severe. Aaron Teffel testified that as a result of the injuries he received in the Iraq war, that pain sometimes... So what did Coley do about that? I'm sorry, what did he do about that? What did he do about it? Well, I think he, you know, the testimony was that he talked frequently with Aaron Teffel about the issue. He tried to address it with him. He took time with him to try and discuss these problems. And he prescribed Percocet, which could not be injected as easily as other drugs. And so I think, you know, based upon the problem is that the pain that these people suffered is so severe. And you're drawing between whether or not there's addictive behavior, the core morbidity, or whether or not there's two diseases that are occurring. One is the disease of the pain, and one is the disease of the prescription. And I think that it is clear, if the court examines the other cases which have come before it, that the level of issues that the court has, the level of prescribing behaviors that were on behalf of Dr. Coley, were nowhere near as severe as those in Feingold or Schneider or Smith. Does he still have his medical license? He does not. There was some sort of investigation or what? No, he voluntarily surrendered. Why did he do that? Well, I believe he thought it was appropriate under the circumstances. I did not handle that particular, it was handled by another attorney here in Chicago. All I can say is that it was, my decision was made that that was the appropriate action for him to take. I will reserve the rest of my time. Okay, thank you very much, Mr. Sendell. Mr. Killian? Thank you, Your Honor. May it please the Court, my name is Randley Killian. I represent the United States here today.  The trial attorney, lead trial attorney, Michael Quinley, is outside the United States representing the government. With regard to the sufficiency, I do want to go off what I originally thought to talk about for two things. First of all is the thought that the United States picked 10 patients out of 500. That's true, we did. We went through, and I even think that the prosecutor in the case said Cherry picked the 10. There's nothing unusual about that. This Court, when it has briefs and issues that it has to resolve, somebody in this Court goes through all of those and determines who's going to be 20 minutes, who's going to be 15 minutes, and who's going to be 10 minutes. You pick the ones that have the most issues. That's what the United States did this time. That's what the United States does in all cases. You go through and find the ones that makes the most or best case that a jury can understand. To sit here and to say that only 10 patients out of all of Dr. Coley's were addicted and receiving painkillers outside the usual course of the medical practice is a complete inconsistent statement with what the evidence in this case would be. Were all of his patients pain-related? No, they were not, Your Honor. Okay, so this is not a narrower field. You know, in the practice or the investigation of doctors like this, there's oftentimes you hear the term pill mill, where a doctor's primary, if not only practice, is pain management. The government never delved into, never painted, never wanted to paint Dr. Coley's practice as a complete and total pill mill. What we did is we focused on the patients, the conduct of the office, the frequency issues, not only in patients returning to get prescriptions early, but, for example, with regard to the sufficiency of the evidence, there was a hospital professional out of Richland Memorial that testified that once a month, every month at Richland Memorial, some 30 patients would show up at that hospital. They would show up to get pain pills. When they would show up, there wasn't even enough room in the waiting room. They had to stand in the hallway because these folks were so addicted, they did not want to lose their place in line. They did not want to lose the chance of seeing the doctors. The most telling thing about the medical professional's testimony from Richland Memorial was that when she would go there to assist, because there were so many people, the prescriptions were already written out. The patients hadn't been seen. The prescriptions were already written out. In addition to that, 30 patients, and she was quite clear on this, 90 minutes. That's three minutes per patient. That's consistent with what other patients said, that when they would go to Dr. Coley to get a prescription for controlled substances where they were doing things like shooting a parent. You mentioned, Your Honor, the fact that with regard to Aaron Tyflin and with regard to the VA, that is a tragic circumstance. There's no one from the government that has ever said that some of these folks, Aaron Tyflin's a war hero, and he needed to be treated like a war hero. He didn't need to be treated like a person who was willing to go to a vending machine to receive controlled substances by a doctor who was wanting to do nothing more than charge $350 to come in and him to say, everything's fine, and get the pills. Why would that be? He had cash, $350? It depended, Your Honor. It wouldn't always be cash. I'm curious about this. The charge would typically be between $300 and $350. This isn't just a guy who, I assume he's taken too much money. There has to be money involved here where he's making a lot of money on passing out these drugs. It's not just doing it because people are in severe pain. We did not focus. We did not focus solely on the money. There was a fraud element to this indictment. The jury returned a verdict of not guilty. That had to do with the insurance charges, as the court knows from the briefing and the transcript. Much of this wasn't insurance billing. Much of this was cash. If you ask me, was this about money, absolutely it was about money. The defendant in their brief says that the government misses the forest for the trees. I would submit that based upon the total transcript in this case, the doctor missed the patients for the greens. He wanted money, and this was about greens. I found this sentence puzzling. $10,000 fine? So he lost his license. He did, Your Honor. Okay. Why didn't you just impose a heavy fine on him? What does prison add to something like this? Prison in a case like this, Your Honor, if you're asking a standpoint of the government and how to combat this issue, opioid addiction is a true problem in the United States. It's certainly a true problem in the Southern District of Illinois, both opiate addiction by pain pills and heroin abuse and misuse. A doctor who makes the kind of money that Dr. Coley does, who pays a $10,000 or $100,000 fine, that does little to them. Well, come on now. A $100,000 fine would be nothing to him? He's some sort of multimillionaire? I don't have my calculator, but it takes $350. Oh, come on. Why was he given a $10,000 fine? Some rich guy for whom $100,000 would be nothing. I don't get the reasoning behind that. You would have to ask. You would have thought of a $10,000 fine for some rich guy, right? What's the point of that? It was a $10,000 fine and 20 months in prison. I mean, you ought to use fines when you can rather than prison. I don't disagree with that. Because prison costs a lot for the government. It does. So why doesn't he get a reasonable fine instead of a slap on the wrist fine? You would have to ask the judge in that case. I'm asking you. You must have recommended a fine. I did. Well, what was it? Your Honor, the government recommended a guideline fine. As we stand right here, because it was an issue, I don't recall what that was as of two years ago, but it was certainly more than $10,000. I wanted to ask you about the other. Could I follow up just briefly? And I just don't want to leave it with that. With regard to the 30 patients in 90 minutes. Judge Posner. Yeah, I want to make sure you're answering his question. I am asking Judge Posner's question. With regard to the fine, there was some extenuating circumstances. Those weren't brought up. Dr. Coley had a child with autism. There was a number of issues that caused the judge to go well beyond the guidelines. Yeah, but that's the sort of reason that's given for not sentencing a person to prison. I don't. If there's a family situation, make it very awkward. This is not a violent person, and he's someone who can apparently pay a large fine, which will send a message to the other doctors in the southern part of Illinois that you'll be ruined financially if you do this sort of stuff. Well, Your Honor, the southern district has had cases like this before. There was cases like this before where doctors have gone to jail. I respectfully disagree. What about this child with autism? I don't know that that's true. Sending the father to jail for two years. I don't know that that's true. That was an issue that was brought up at sentencing. We never followed up on any of those things because that was an issue that was brought up by the defense during the course of the sentencing, medical issues and other things about Dr. Coley. What did the judge say about that? He took it into consideration and made his decision. As I stand here today, Your Honor, sitting in the courtroom and practicing in the southern district of Illinois, in all due respect to your belief that $100,000 would cause a doctor to second-guess his money-making operation, I strongly submit that 20 months in prison would do far more, and I believe that that has a much better impact on rich guy, white-collar folks. I think the history of this country and the history of white-collar-type prosecutions is we find them... Well, most people who study these questions think that 2,300,000 people in prison is too many. I don't disagree with that, Judge, and I don't disagree with the Department of Justice's policy on making a better approach to who we incarcerate. I think on the facts of this case, when considered with the dangers associated with these folks, a decision to prosecute and seek jail time was an appropriate sentence. Likewise, the judge cut the sentence from the guidelines dramatically, and the government did not appeal that because we felt that that 20 months of incarceration was something that would send a signal to doctors that this wasn't just a money issue. This was something that could take their license and incarcerate them. What was the guideline range, the high of the guideline range? Your Honor, that wasn't brief, but I believe it was 120 months is what he was looking at. It was like 10 years of imprisonment is the amount. It was a substantial departure. Internally, we discussed, and there was the opportunity to appeal that as being unreasonable. However, in light of Judge Gilbert's handling of the case, which this was a month-long trial, the handling of the case, his review of the 3553A factors, and his determination, it was the belief that 20 months of incarceration would, in fact, send the signal that we needed to be sent, not just in the Southern District of Illinois, but around the country, that opioid abuse and the assistance of doctors in opioid abuse is something that we cannot tolerate. Go back to one other thing. On the 30, I guess you'd say, people who would get there on the first day of the month or whatever when their prescription ran out? With the way the law works with the Schedule IIs, a patient has to come every 30 days. So they would show up every 30 days. Okay, well, those are people, I assume, who have chronic and incurable severe pain. I would not say incurable, because some of the folks were, in fact, duping the doctor. Some of these folks did, in fact, have pain. I don't know that the pain is incurable. We didn't... This was not an issue of whether the patients had pain. We weren't going to litigate that. Was it $350 for each of those 30? Yes, it was. In fact, with regard to Christy and Charles Walton, when they would go in on occasion, I don't remember the exact number of times, when they would go in to see Dr. Coley, he would see them both together in small talk. They both paid $350. Okay, well, that's important to me. $700, and they both walked out with a prescription for a painkiller, a controlled substance that, if taken inappropriately, could kill them. And oftentimes, when these folks would come back, they would test positive for things like heroin. And then Dr. Coley wouldn't talk to him about the fact, hey, we give you a toxicology report. With the opioids, the Percocet, none of that's showing up in the toxicology, but heroin's showing up. He just continued to give controlled substances. There's one other thing that I really want to... Well, let me now. I want to get to my question. So the government expert gave his opinion as to really the same question the jury was going to have to decide. Weren't there any directions to the jury that the expert was only testifying about the standard of care and not the legal question like the judge did in that Chuby case? And isn't that a better practice for the jury to get direction from the court so they have a context in which to weigh that and apply it? Well, there was no objections to that process. There was a jury instruction that dealt with how to handle expert testimony. With regard to Dr. Perrin, as he has done in other cases, he did not at all ever talk about the mens rea, the criminal standard. In fact, he emphasized, hey, look, I'm a doctor, I'm not a lawyer. I don't deal with those type of things. All I can talk about is looking at these patient files and making a determination on those patient files whether, in fact, the doctor had gone beyond or outside the scope of the normal practice of medicine. So with regard to that, I think it's clear that the jury certainly understands. The instructions, all three, we haven't gotten to the instructions, but those were not objected to. In fact, they were jointly tendered on. Two of them, one of them they affirmatively agreed to. But those jury instructions outlined clearly what the jury had to find also had the good faith, had I believe that instructions 15, 25, and 26 fairly told the jury the standard and made them aware of what the law would be. If I could, I would like to discuss one other thing, and that is the fact that the defense raised in their brief the fact that Dr. Coley cut off three people and that three people weren't being seen by Dr. Coley at the time that the government conducted its search warrant. Out of those three patients that they say shows that he was exercising some level of judgment and cutting patients off. And first of all, cutting patients off is not how to deal with somebody with addiction. The way you deal with somebody with addiction is you either continue treating them appropriately or you refer them to addiction specialists. With regard to these three, the first one is Charles Walden. Charles Walden stopped showing up. Now there's no explanation in the record why that was. Certainly Dr. Coley didn't tell him. One could argue, or one could guess. Maybe I'm guessing. He didn't have $350 to keep showing up to get controlled substances. The second one was Tammy Bollinger. Tammy Bollinger was a person that was not terminated by Dr. Coley the first time. She got arrested for forging one of his prescriptions. And when she got out of jail, after seeing another doctor not liking him, she came back to Dr. Coley who continued giving her controlled substances. He didn't cut her off until she tried to OD and attempted OD. She did not die. So that's two of the three that they hold out. The third patient is a guy by the name of Todd Feldkamp, someone who I think in the defense brief points out that he was totally incapable of testifying at trial. He was so addicted. He was calling. He was coming in. He was constantly seeking drugs. They were charging him the $350, and if he made a phone call it was $50 more. I submit to you that the reason he cut, and that's the one he did cut off, I submit to you the reason he cut that one person off wasn't because he was addicted or showing addictive behavior or it was in the best interest of him because he didn't refer him to addiction. What I submit to you is that it became a true cost-benefit analysis because it was costing too much of the time of the office, too much resources to deal with him on literally a day or a weekly basis. And with regard to the question that you posed... Okay, thank you. Oh, I apologize, Your Honor. Thank you. Okay, Mr. Welby or Mr. Sindel. All right. May it please the Court. Thank you for allowing the two of us to split the time on this argument. I appreciate that. I know it's a little out of the ordinary. Well, since he's hiding, you had to stand up. Nobody left yet. Judge Posner, I want to start with the point you raised on the sentence. We did not appeal the sentence, so in fairness, I just wanted to illustrate the impact this has had on his family. Dr. Coley is in the Marion Correctional Center right now. His family goes to visit him every Sunday. They're there. They spend hours with him. It has devastated on the family. I went with him one time and spent the morning with Dr. Coley and his children, including the daughter with autism, and they have to go and sit there and be with their dad and try to have the best type of relationship that they can, and they're from a family whose culture, the father plays a very important role. He has all daughters. It's been very hard for him. He has daughters of a marrying age, and he's not able to present those daughters to eligible husbands, and it's just been very devastating. He is not a multimillionaire. He lived in a nice home in Effingham. His office building was the biggest asset that the family had, and that's subject to forfeiture, which is still an ongoing process. It got to the point where he had to file a motion for informal paupers to be allowed to proceed, which was denied, and only with the help of his family was he able to afford the cost on this appeal. So the sentence is severe. The sentence of 24 months in prison is something that, as the court notes, is extremely harsh in this case. But getting to some of the facts of the case, the issue of money has been raised a couple of times, Judge Mannion, and I think we cannot ignore the fact that he was charged with five different financial crimes and was found not guilty on every single one of those charges. He was charged with three counts of health care fraud, for Medicare fraud, Medicaid fraud, and insurance fraud. The jury found that he was not guilty of those crimes. He was charged with money laundering for different transactions of sending money, saying that the money came from illegal proceeds. He was found not guilty of that. The government made much to do about this case being all about money and that the doctor didn't care about his patients and he didn't care about their well-being, and he only cared about the money. The evidence didn't support that. The jury didn't find that to be true because it wasn't true. He mentions these patients that went to the facility in Richland and that 30 patients would show up. There's no evidence that all of those patients were paying patients. The doctor had ñ he was a neurologist. He had lots of different patients that might have Parkinson's or any other neurological problems. This is a small-town doctor who would go to these little ñ Effingham's a small town. Going to Richland or some of these other smaller communities was a service that the doctor provided so that his patients didn't have to travel all the way to Effingham to get the care they needed. Some of the patients ñ or the nurse said that some of the prescriptions had been written in advance. Those were refills that patients who would come every month, they would get a certain kind of medicine for their chronic conditions which had not and would not change. Those would be drafted in advance. They would be filled out but not signed until the doctor examined the patient. There was not one piece of evidence that the doctor in any situation had a predetermined, pre-written prescription that somebody just came in and picked up without being examined by the doctor. So it's not on the capsule or whatever. It says two refills and that sort of thing, so you just go to the drugstore and get them. They could not do that. So each time they got a refill, they had to get the doctor to sign off on it. They had to get a brand-new written prescription because these were Schedule II controlled substance drugs. So in that instance, they couldn't ñ like my blood pressure medicine, I'd just go and get a refill and after a year or so, I'd have to go to the doctor again to get the process started. That's not true with these patients. These patients had legally to see the doctor every month. So the frequency issue is a little bit of a red herring. It's true. Some of the patients abused it. Some of them came in a little early. So how do you deal with that three-minute visit time, that average three-minute visit time, 30 people in? The situation is that these are people that have a bad back or they have a bad hip or a knee, or in Mr. Teufel's case, his leg had been damaged by an IUD in Iraq. Those conditions aren't changing. The doctor checks on them. He checks on their stability. He has them fill out a lot of information in advance because they're dealing with pain, and a lot of the pain is self-reported information. So we had questionnaires that they would prepare while they were in the waiting room. You would be able to see them in that period of time. These three-minute exams, these are not initial visits. These are not new patient visits. He sees their patients coming back to get a refill. The doctor is checking on them. He would often check their prescription monitoring program to see if they were getting drugs from outside sources, and he would talk to them about that. He would also have them do drug tests from time to time. What's the $350 for? Is that the cost of the drug? No, Your Honor, that was the cost of the office visit. That's where it gets kind of, I guess, a problem. They come in and say nothing new, I guess. Say I still feel terrible, the pain's awful, et cetera, et cetera, and there's no change. Well, but it's a $350 office visit to get that renewal. I guess that's what sort of sticks out for me. That's been a problem. It was the cost that he charged everybody for all of his office visits. It wasn't as if he picked people that had substance abuse, red flags, and said, For these guys, I'm going to charge $350. If my mother went there and saw the doctor for her neurological problems, he would have charged her $350. If he billed the insurance company or Medicare or Medicaid, they only pay what they're going to pay. But the individuals who didn't have that, then they had to pay. Well, all these people had no insurance. Is that resumption here? Not all of the people, Judge. Some of these were submitted, I suppose, with insurance. I believe that's correct. Insurance will pay part of it and pay the rest or something like that? No, if they had insurance, then there would be a co-pay for Medicare or Medicaid. So these $350 people are not insured, I presume. I think the charge was $350 for everyone. The ones without insurance or Medicare or Medicaid had to pay $350 in cash. I think the Waldens are an example of people that paid. They wrote a check. My time is up. Thank you. Thank you all very much. Thank you to all the council.